I am here today, Your Honors, on behalf of the Appellant Court of Appeals, to ask the Appellant, Ms. Tracey Fleming, and the primary thing I'd like to focus on today is the design to enforce requirement. This has been the law in Texas since 1994, and it's one of two requirements that the Texas Supreme Court says must be met in order for a non-compete to be held ancillary to an otherwise enforceable agreement. In other words, if we read the statute, the statute says, to be enforceable, the covenant not to compete must be, quote, ancillary. And in 1994, in light, the Texas Supreme Court said, here are the standards, and there are two of them. One of the two is the design to enforce standard. So what is that? It's a focus upon the promises by the employee, the promisor, in this case, Ms. Fleming, in the otherwise enforceable agreement. The otherwise enforceable agreement is the shareholder agreement and the amendment. And once we've identified what those promises are, then we look at, is the covenant not to compete designed to enforce them? So in the light case, back in 1994, the court analyzed what are the employee's promises, what are there, and what's not there. And what was noticeably absent was any written contractual promise by the employee saying they would not disclose confidential or proprietary information of the employer. The court analyzed some of the other promises of the employee to give an inventory of property, to give notice of resigning, and said, the covenant not to compete has nothing to do with those. It's not designed to enforce them. And it held it unenforceable. Absolutely. Were those particular arguments presented to the district court specifically that Providence did not prove that the shareholder agreement gave it an, and I'm quoting, interest worthy of protection? And also, you used the term designed to enforce the return promise in the shareholder agreements. Those arguments were made in the district court specifically? The arguments we made, Your Honor, again, it's in the Eastern District with multiple causes of action and about a ten page limit. We argued that it was unenforceable and we argued that a confidentiality agreement was absent. We did argue that. Did I use the exact same words as Your Honor? No. I would point out that in Providence's brief on this appeal, knowing this was our argument, they said the intent of the appeal was to get these matters before the Fifth Circuit. I think Judge Jordan is waiting on making some rulings depending upon what this court decides. On the issue, let's, just talking about waiver, it's discretionary whether this court enforces a waiver if it thinks I didn't adequately brief it. One factor is, is it a pure question of law? And my argument today is you can look at the two documents, apply the design to enforce, and see it's unenforceable. It is a pure question of law. I hear you. Let me just follow up one thing on what Judge Engelhardt asked. These arguments you're making here are as to prong one of the test for the enforceability of a non-compete? It's actually, I think, prong two is what is often referred to. In fact, prong two is about the reasonableness of the restraints as to geographic area. No, Your Honor. As it relates to ancillary, there are two prongs which light set. One is, they call it a give rise to requirement. But the second one is a design to enforce requirement. And we can see in a . . . Yeah, I see that. So, the reason I ask is because I thought the district court said there was no dispute as to prong one of the test. Well, so, I'm not sure which test we're talking about. Well, I mean, okay, maybe we're just quibbling about the different parts of the test. I thought there were three parts of the test in the Texas Business and Commerce Code, Section 15.50A. So, one is, is there an otherwise enforceable agreement? Ancillary two are part of an otherwise unenforceable agreement. Yes, and that's two. But what I'm saying is under part two, ancillary, there are two requirements which must be met. The second one is the design to enforce, which is what I'm arguing today. Okay. And you're, are you representing to us that this argument was made below? I am, Your Honor. And again, not using those exact words of design to enforce, but we did argue that it was unenforceable. But unenforceable includes a lot of different grounds that you've argued. It's unenforceable because it's overly broad or there was insufficient consideration. So, it, I don't think saying that it's just unenforceable as a blanket statement would raise in particular the failure of the document on these specific grounds unless you've argued it elsewhere. And again, Your Honor, my point is if you believe that and are saying, was there a waiver? The issue, again, it's discretionary on the court. Do you find a waiver? And the two things to consider, is it as a matter of law, which is met here? And second, is it a manifest injustice to my client to find a waiver? She's been put out of work in the county in which she worked for two decades. So, leaving this preliminary injunction in place would be a manifest injustice. I think we understand your argument. So, let me ask you, too, about since you were getting to the 2013, April 2013 agreement, how did Ms. Fleming's duties change? She came on board at Providence in 2008. And then in 2013, we have an agreement which is the subject of this litigation. It contains, it's a shareholder's agreement. How did her responsibilities change commensurate with the agreement in 2013? It refers to an advisory council, Your Honor. And so, she began serving on that advisory council and it says somebody has to be employed as an employee or independent contractor in order to be on that. But otherwise, I think no change. Okay. So, as it relates to confidentiality, in light, the court said, in order for the agreement to be designed to enforce employers, we will tell you how to write an enforceable one. If you put in there a promise by the employee to keep matters confidential, then the non-compete is designed to enforce it. Why? Because a non-compete is saying basically don't work for a competitor. The confidentiality agreement is saying don't disclose confidential proprietary information to a competitor. When they are at the same time, the non-compete is in effect keeping the employee from providing the confidential information it's designed to enforce. That promise is absent from the documents before this honorable court. And we note in Hunn v. Dan Williams Holmes, 2015 Fifth Circuit decision, the court addressed a non-compete where there was no confidentiality promised by the employee and found it unenforceable. Within the last 12 months, the Texas Supreme Court, and this is after we filed our notice of appeal, issued its decision in Titan Oil and Gas v. Willis. In that case, Titan Oil and Gas, the Texarkana Court of Appeals said that the design to enforce standard is the law in Texas. We can't change it. We can't modify it. And they applied it in that case to find the covenant unenforceable. They specifically looked at the Marsh U.S.A. case of the Texas Supreme Court and said Marsh did not change this prong, which I'm calling prong two, the design to enforce requirement. We can see that in Marsh because the court recites in Marsh that the underlying agreement had a majority opinion, recites the design to enforce requirement, and it says this is not an issue here. So that's what's happened in Texas jurisprudence is since Light said how you draft one in order to meet the design to enforce requirement, employers, all you have to do is put that confidentiality promise in there for the employee, have them sign it, and then it's designed to enforce. That's what employers have done, and so there's very little discussion about that standard because courts typically recite that was in the agreement, and then it's a no-brainer. The design to enforce is met, and you move on to the other requirements. I'd like to address two of the arguments made by the appellees. They're saying the agreement says in terms of the no-solicit agreement, it's a one-year promise which runs from the effective date of the amendment. The first preamble of the amendment says the effective date is April of 2013. So that's what the one-year period is. They're asking this court to rewrite it, and I'd ask the court not to do that. Second argument they raise is that the closing date for the, it's capital C closing date, is something other than, that the non-compete runs from a date other than that, and we can read the non-compete. It says it runs from the closing date as defined in a particular section of the contract, and so we ask the court not to rewrite what is the plain language of the contract. The last thing I'd like to address on their points, so a non-compete typically has, here's things that the person can't do. Can't be employed by, affiliate with, et cetera. Next, who can they not do it with? Competitor, company in a similar business. Last is the geographic area. In our case, it's the four big counties in Texas and contiguous counties. The trial court correctly said that geography modifies what it is the employee cannot do. So if I'm the employee, I can read it and say, okay, I can't do it in those four counties and contiguous ones. That's where I can't do my activities. Providence is claiming that geography words modify who the competitor is. So they say, okay, because the competitor is truly and truly does business in one county in there, then worldwide my client can't work for truly anywhere in any capacity, whether as a janitor, as a receptionist, and that would be clearly a terrible reading of that provision, and it would be very much overbroad. We've also argued in terms of the reasonableness of the covenant, which is the last thing, if the court's fine, it's enforceable, the reasonableness, and we look at the proof at the hearings below. There's literally no proof that Providence actually did business or that my client did all of the counties which are mentioned in that non-compete. It's just not in there. Truly is not active in the counties that are listed. I think it's at certain counties as well as the contiguous counties. Is truly active business-wise in all of those counties? And again, looking at the record, Your Honor, that's just not discussed as far as I know. And Providence did not put on any proof about that, and there's no proof Providence did business in anything, I believe, other than Johnson County, which is where my client primarily did business. Is there a case that says it's unenforceable in counties where the plaintiff isn't active? It seems like a plaintiff maybe has some aspirations that we don't want you in these counties because we intend to, but is there a case that would use reasonableness? So I'm not citing you a specific case, but again, the court can decide whether it's reasonable for someone trying to enforce one of these and keep somebody from working to do it in counties where there's no evidence that the person actually engaged in activities there or that the plaintiff engaged in them. So what you're saying is if the contract had said you just can't compete in Texas, that wouldn't have flown. I mean, I've seen a lot of them. Actually, people sometimes think, well, if you just pin it down to one state, you're being real reasonable. But what you're saying is that won't fly. That won't fly, Your Honor. And again, if the employee hasn't worked in any of these counties, and if there's no proof that they have, and if there's no proof that the plaintiff who's seeking to enforce it worked in them, then how can we say that that's reasonable? Oh, if the plaintiff worked in Dallas, say, and they wind up with a contract that says you can't compete in Texas, that's not going to fly under Texas law? Well, the issue is what's reasonable under the facts and circumstances of the particular case and the record before the court. And so I think in this case, it would be unreasonable, Your Honor, what you're saying. Counsel, thank you. You have time for rebuttal. Mr. Hastings. May it please the Court. Providence Title Company is here asking this court to affirm the district court's injunction, but to also correct two issues of contract interpretation on the cross-appeal. This case is set for trial in mid-January, and we believe, and I believe all the parties agreed, that we would all be better served to have the contract interpretation resolved before we go to trial, and the contract interpretation issues go to the ultimate issues of relief, including the injunction. I do want to start, though, with the injunction that's currently pending against Ms. Fleming, and then I'll move to the cross-appeal after that. To put this in context, and Judge Englehart and Judge Duncan, I think both of y'all have picked up on something that's important. Here's how this issue arose. Providence moved to enforce the non-compete, which this non-compete, just like the Marsh case in the Texas Supreme Court, relates to the goodwill and the business, the ownership and interest in the business. Ms. Fleming really did not contest the enforceability of the agreement, and this design-to-enforce issue, which has taken on a life today, and it's in the briefing, she really did not contest that point until the motion to reconsider after the district judge had already entered the injunction and the parties had already put on the evidence. But I am prepared to discuss why that element is met under the trial court, but that's the timing. If you look at their response to the motion for preliminary injunction, the argument that was presented to the judge in the trial court, they were not contesting this point, and I think for good reason, because under Marsh, this contract clearly relates to and is designed to enforce and protect the goodwill of Providence's business. So when Ms. Fleming agreed to become a shareholder in 2013, her job did change a lot. It's not a little. She agreed in the contract to take on a significant management role, to be on the advisory committee at Providence, which is the board of directors. She agreed to take on that role, and under Texas law, when a person accepts a position of responsibility, this is the Mann-Frankford case that's cited in the briefing, there's an implied promise that the company will provide her with whatever's needed to do the job. But it wasn't just implied as Judge Jordan found. This is page 25 of the injunction order. He found, as a matter of fact, Tracey Fleming was privy to all of Providence's confidential information. She was involved in business strategy. She was involved in everything at the company. That went with her promise to be part of management. I would also point out, we have lots of evidence in this record. For example, we have the organizational chart. I believe this was page 5094 of the record. You can see Ms. Fleming at the top of the chart with all of the branches reporting up through her by name. We had the list of employees and their offices. This is page 5069 of the record. Ms. Fleming is the second name on the list out of hundreds of employees. The only name that was above her was the CEO. And she's listed as working in the main corporate headquarters, not just Johnson County. Just real quick on as far as counsel's statement that there's no evidence in the record about Providence's business, that's false. There is an extensive record of Providence's profit and loss statements by office showing where their locations are in the very county subject to this non-compete. There's a lot of evidence in the record about Providence's business. In all of those counties? Yes. In all of the counties that are subject to the non-compete. To the non-compete. Yes. And so, Your Honor, when Ms. Fleming took on the management role, she got access to everything and she's the number two person in charge of everything for the entire business. And from that, she gets developing and growing the goodwill of the business. And just like in Marsh, as an owner, she's ownership and goodwill go together. She also agreed that if she left the business, she would sell her stock back to the other shareholders. The purchasing shareholders are entitled to the goodwill of the business. That's what they're buying and rebuying back from her on the stock sale. So this is an agreement protecting the goodwill of the business. And that's what the non-compete does here. Let me ask you about, in particular, the use of the term closing date, which is a defined term in the agreement. We know what that date is, the date when the stock we just mentioned, the stock is sold back. It's obvious that that date is not going to be commensurate with a surprise departure, which in this case I think occurred in February, and then the closing date is April, if I'm not mistaken. Late. So it's some two or three months later. How does that undercut your argument for your injunctive relief in terms of irreparable harm? Because it seems like she is free to engage in business elsewhere, including the same business, up until the time of the closing date. Your Honor, I have two responses to that. First, that is an incorrect reading of the contract, which I do want to address, which is our cross-appeal. But even if we're wrong about the contract, Judge Jordan found, as a matter of fact, there would be irreparable harm. Page 25 of his order is important, because Ms. Fleming, if she continues to work with Truly in violation of the non-compete, she's got all of Providence's information. She's in a position to help a competitor with all of that information. And so there's continued harm, and as a finding of fact, continued reputational harm associated with Ms. Fleming being associated with that business, she's a known person, especially in the Dallas-Fort Worth area. Truly gains a benefit if she continues working with that company in violation of the non-compete. That's a finding of fact from the district judge that has not been challenged on appeal. I do want to come back to why we believe that Judge Jordan made a mistake in construing that contract, and I do want to put this in context. By the time the injunction was entered, this issue should not have mattered on the timing. It was vigorously contested by the parties, because when we moved for the injunction, we had not reached that May closing date. But by the time the injunction was entered, everyone agreed that the closing date had already passed. However, he did construe the contract and gave his legal interpretation. The problem is, we're now 18 months into this case. Collectively, the defendants and the non-compete kind of sprung into existence a few months later. Kind of what they're arguing here is, she left in February, but the non-compete doesn't start until May. There's not a single case cited anywhere in this country that's read a non-compete that way. And so that's the first— What about under the terms of this contract? I mean, when you say there are cases not read that way, this contract seems to be unique in that sense, that it has defined a date, and are you asking us to sort of rewrite that part of the contract so that when she leaves for the last time, that's when the non-compete starts? So, Your Honor, we're not asking the Court to rewrite the contract. We're asking the Court to apply the plain language of the contract consistent with Texas contract law and interpretation, which is important. Frost National Bank, the Riley v. Rangers management cases cited in our briefing, contract must be construed in context of what it's designed to accomplish. Very important case, the Koresh case cited in our reply brief, the Texas Supreme Court's quote, 2011 decision, under general rules of construction, we must — we avoid strictly construing an instrument's language if it would result in an absurd result. That's the situation. Well, okay, so help me with just coming on with Judge Englehart's question. Tell me if I'm reading the wrong language. I'm looking at the non-compete. Yes. It starts, this is ROA 1076, offering shareholder agrees, is this the right language, for a period of 24 months — That's correct, Your Honor. — from the date of the closing defined in Section 8.1, he, she, will not, et cetera, et cetera, et cetera. So that's the language that I have to start from, right? That's correct, Your Honor. So help me to get from that language to where you want us to go. District Judge is giving a very strict construction of the word from. That word from is being read as — there's two ways you could read this. We believe the correct way is to read from as this is defining the end date of the non-compete, which is consistent with non-compete law. You have a non-compete, the employee leaves the employment, it applies for a period of time, you have to know when it ends. You want more than two years. You want — Two years and three months. So — and, Your Honor, Texas law supports that as a reasonable time period. But then you want us to change not only the starting date, but also the length. No. No, Your Honor. I don't like it. No, Your Honor. The end date, this language tells us what the end date is. To determine what the end date is, it's from the date of closing. So from the date of closing for the employee. It doesn't spring into existence later. There is no case that has ever held that. And so we read this as setting the end date. The error the district judge made is reading this as saying, not only does this set the end date, it starts here. It's the equivalent of the judge putting the word that this starts from closing. And so that is rewriting the contract. And again, the Koresh case is very important because you have to not strictly construe the language to reach an absurd result. You have to read language in context. And for a non-compete, they call it unique and unusual. Well, it's absurd to say that someone could take everything, all the state secrets of the company, sell it off to the highest bidder, but as long as she finishes by May 24th, it's fine. That is completely absurd and guts the value of a non-compete, and that's why there's no case anyone's found where this has ever been applied. I can remember reading these briefs and looking at that problem and saying, somebody dropped a stitch here, I think. Well, Your Honor — Was there a mistake? I mean, is this not drafted properly so that it's created this, what you say is a glitch? Well, Your Honor, we certainly, in hindsight, I'm sure we could write it clear. But we're not asking the court to rewrite it. We're asking the court to follow settled Texas law of construing a contract in context. Why can't you just be relegated to monetary damages up until the date when she's out? Now she has to sit out for two years. I realize that's very unusual, and there's no case that suggests that that has happened. But under the contract, wouldn't that also be a reading of the contract that is warranted? If she leaves her employment, you're entitled to monetary damages, and then you close the stock sale, and now she's out for two years. Well, Your Honor, that would actually deprive Providence and the other shareholders, because this was a mutually agreement from all the shareholders. It would deprive all the others of the benefits they were entitled to, because the non-compete is protecting the goodwill and the value of the company. And if that reading were correct, that would literally say Tracey Fleming could have sold off to the highest bidder. You know, if somebody wants to pay her $100,000, here's our customer list. Here's the roadmap of how to do this. That's the opposite of what a non-compete is intended to accomplish, Your Honors. And so we think the mistake was not reading this in context. Damages are certainly available, but as this Court, like in the Janvey case and others, just because Providence can pursue damages doesn't mean that irreparable harm isn't occurring. The Texas law, we've cited, I think, three or four cases, but there are dozens of cases where the Texas courts and the Federal courts in Texas have said this is the quintessential example of irreparable harm, a non-compete agreement. And so what we believe is that on the cross-appeal, that the non-compete, this Court should recognize that the non-compete needs to be read as a Let me ask you, is it possible for the plaintiff, well, I should say the defendant, Ms. Fleming, to work for truly in counties not listed in the non-competition agreement without, as a practical matter, violating the agreement? No, Your Honor, and that's the second point on our cross-appeal, which I would like to address. Under the district court's ruling, she's allowed to do that, and that's what she's doing today. She's running offices for truly in East Texas, in Tyler, and she's growing a business in East Texas. But under the language of the non-compete, she's not supposed to be able to affiliate with a company competing against Providence in its home territories. It's just like the Ameripath case from the Dallas Court of Appeals. That's significant because we're dealing with someone who's got the entire road map of the business. If she's allowed to go to Tyler, I mean, we're in the world, as the Court knows probably better than anyone, I mean, the remote work and remote viewing. If she can just go to Tyler and help someone compete against Providence in the Dallas-Fort Worth area, that is violating the language of the agreement and, again, undermining the protections that the non-compete was supposed to do, undermining the value of the company. Because of her position and her role at the top of the company, she should be living with the entire non-compete, which is not helping someone compete in Dallas. That's what Trulie's trying to do. They were a new entrant into the market. When she joined Trulie, Trulie had four or five employees in Plano. This was a major move for Trulie to be coming into Texas. And the record will establish that Trulie first tried to buy Providence in 2019. It didn't work out. And this is a lot of the issues for the trial in this case. That didn't work out. But after failing to buy Providence, they did the next best thing. A year later, they went and hired Providence's board member and president in multiple offices as they're going to move into the market. This is exactly what the non-compete was designed to prevent, to protect Providence's value and goodwill. Now, on the cross-appeal, with respect to the, I guess, is it right to say the geographical scope of the injunction, you're asking for the PI to be expanded? We're not actually asking this court to expand it. Okay. And that's because that is a discretionary call for Judge Jordan, and that would involve balancing of factors and all those equitable reliefs. You want some relief. We're asking the court to correct the reading of the contract. And that's relevant for the What the evidence will establish is that from June 1, I believe, when the judge entered the injunction, through today, all Ms. Fleming did, instead of not being associated with Trulie, is she moved to Tyler and for a year has been working with and helping Trulie grow its Texas business. And so that is going to be an issue for the trial, ultimately. And if this court agrees with us on the reading of the contract, then we would have to go back to Judge Jordan, if it's appropriate, and try to convince him about the scope of the injunction, or maybe not. Did you argue that his injunction was, I guess, unduly limited to the subject counties? Did you argue that in your motion for preliminary injunction? No, Your Honor, and I want to put that in context. Okay. Because that injunction was entered on June 1. At the time it was entered, Ms. Fleming was working in Johnson County, that's in the Dallas-Fort Worth area. Then they appealed that injunction. So that injunction then comes up on appeal. She didn't move, and the evidence did not establish that she's competing in East Texas. We did not have a record of her doing this until after she moved. And Your Honor, that's part of the reason why I'm not asking this court to be commenting on the scope of the injunction, because it is a call for Judge Jordan, but under his reading of the contract, and his legal interpretation of the contract, we would literally have to go back to Judge Jordan and say, Judge Jordan, I know what you wrote, but you're wrong. And he's already told us what his reading of the contract was. That's why we're asking this court to correct it. And if this court corrects it, then it's up to Judge Jordan to decide, you know, how the new facts and these consequences should play out. But to directly answer your question, Judge Duncan, the reason we didn't talk about this beforehand is, prior to this appeal being filed, we didn't have any evidence of what she was doing. So we weren't going to go back to Judge Jordan and tell him, first, you're wrong, and second of all, we're concerned she's going to do something, because we didn't know what she was going to do. So the fact that she moved to East Texas is a problem? Yes. Yeah, well, then what? Then what if she moves to Houston? Houston is actually in the injunction, Your Honor. So she's expressly covered by the injunction. The East Texas is a problem under the construction of the non-compete, but she did that about a year ago. And ultimately, this court, we're asking for the guidance to respond to what Judge Jordan did to tell us, was he right or are we right? And once we know the answer to the contract question, then we can figure out how this plays out going forward. But it sounds like you're arguing that because a person can work remotely, which is now very, very common, we don't really need to list the counties the person can work remotely and therefore we just don't want her to compete, period. Is that a fair statement of your argument? No, Your Honor. A fair statement of our argument is follow the exact language of the non-compete, which is exactly— That's limited to certain counties, though. Which is exactly what Ameripath did. Ameripath is Dallas Court of Appeals. You had a pathologist who was running their offices in their Dallas-Fort Worth area. The Dallas Court of Appeals said, you can't help someone compete in Dallas-Fort Worth. I don't care if you're doing it from New York. You can't be helping someone compete in this jurisdiction. That's what this non-compete says. It's the Ameripath case, the exact fact pattern we're dealing with. What she could do is she can go to Tyler and work for anyone else that's not competing against Providence in Dallas. She just couldn't go with a Trulie or someone whose whole plan was to come in here and pursue and grow their business in Dallas. The case really is we're in a very different environment than we were because of computers and all of that than we were when the law that was developed on this subject was put together. In this case that you've got, now she's in East Texas. Well, all right, so they shut her down in East Texas. Then she can move on to what? Atlanta? I mean? And Your Honor, if I may make one quick comment, which is yes, the world has changed a lot. Which is exactly why a non-compete is written the way this is, which is she can't help someone compete in this jurisdiction. She can't do it from Dallas. She can't do it from New York. It's like the Ameripath case. It's perfectly reasonable. If she wants to go work for someone who's in Tyler or someone who's in Louisiana that doesn't compete against Providence in its jurisdictions, she's free to do so. She has a lot of options in the country. They're focused on specific counties and she cannot take all of her management knowledge, all of her knowledge of the business and the market and take it to use for someone else to compete directly against Providence in the counties where it's located. Thank you very much, Your Honor. Mr. Diven, rebuttal. Your Honor, counsel has brought up that there was hearings that were held and a record made then and he's arguing to the court based on things that my client allegedly doing months and months after that. They're not in the record. It's an argument outside. Second thing I'd like to point out, Your Honors, is counsel argues about all this confidential information and the assumption is, well, if she was a high up person in an organization, then all of a sudden information is automatically made confidential. That's not the law. The law is that if I'm the secret owner, I have to take reasonable steps to protect the secrecy of it, namely advising others that things are secret, telling them it's confidential, holding trainings, having them sign confidentiality agreements, et cetera. There's no evidence in the record that truly did that regarding any of these things. Instead, it's after the fact, after the lawsuit's filed, they start saying, well, because of the type of information it is, it's salary, oh, that must be confidential. That's simply not the law. In terms of the design to enforce argument, counsel identified no promises by my client which the covenant's designed to enforce. That's their obligation. Her promises were to buy stock and then to sell it back. A non-compete doesn't make her more likely to have bought it in the first place or to sell it back. This just simply flunks under that test. Counsel brought up goodwill is really the reason for the non-compete. And this goes to the different problem, the one I didn't talk about earlier, which was originally from a light case arising from the covenant had to arise from the employer's interest. They changed that wording. Let's talk about goodwill. If we go in the record and we searched the word goodwill, nowhere in there is there any evidence that this non-compete was to protect the goodwill of Providence. Nowhere in the documents which are in front of you, Your Honor, the shareholder agreement or the amendment, is the word goodwill mentioned. Last, in Marsh, there was a stock option agreement where if the employee exercises at a low strike price, that he can get the difference between that and the fair market value, fair market value being on the New York Stock Exchange, which includes goodwill, creates an incentive for the employee to enhance the goodwill of the employer. In our case, if we look at the sale provision, I think it's 7.1, it says the sale price for her stock, it starts off as the, quote, stated value, an undefined term, as set by an advisory committee if it's set at within a certain time period. Stated value does not include in it a definition in the contract anything about goodwill. So if I'm her, I don't have the same incentive as does the employee in the Marsh case where the Texas Supreme Court said that the prong that it originally was arising from, they changed it to a nexus between the employer's interest and the non-compete. Doesn't compute, not the same facts, not the same incentive. They raised the fact that if they're the purchaser of her stock, well, then they have rights to protect that purchase price. The evidence before you, Your Honors, is zero has been paid. We've argued that in our brief. They don't dispute it. And Judge Jordan in his decision said the parties are negotiating. That doesn't make Providence a purchaser of her stock and doesn't give them a right to enforce the non-compete. So there's no confidentiality promised by her. The argument about goodwill they make is not supported by the record. And the argument they make about being a purchaser and that Your Honors should protect the rights of a purchaser just doesn't hold water. Last thing, they've argued that from in the closing date means you date backwards, I think, from the May of, the May date, the closing date, which would mean she's not under the non-compete today. If you measure from dated backwards. Are you saying that's the end date? If that's the end date, is it that May date? It doesn't have to do with the beginning date. Exactly. That's what their argument is. Yes. And what I'm saying is if that's true, then my client's not under a non-compete now, even, or shouldn't be, because you're measuring back from a date that's already passed. Okay. Thank you, counsel. Thank you. Case under submission.